MELINDA HAAG (CABN 132612)
United States Attorney

MIRANDA KANE (CABN 150630)
Chief, Criminal Division

SUSAN E. BADGER  (CABN 124365)
HARTLEY M.K. WEST (CABN 191609)
Assistant United States Attorneys

    450 Golden Gate Ave., Box 36055
San Francisco, California 94102
Telephone:  (415) 436-7200
Fax: (415) 436-7234
E-Mail: Susan.Badger@usdoj.gov
         Hartley.West@usdoj.gov

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | No.  CR 11-0497 CW |
| Plaintiff, | GOVERNMENT'S SENTENCING MEMORANDUM |
| v. | Date:    June 19, 2012 |
| RAYMOND THOMAS, JR., | Time:   2:30 p.m. |
| Defendant. | Court:  Honorable Claudia A. Wilken |

GOVT'S SENT. MEMO [THOMAS]
CR 11-0497 CW

1

2

# **TABLE OF CONTENTS**

3

DISCUSSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

A.  The Offense Conduct. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

B.  The Guidelines Calculations.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

C.  The Government's Sentencing Recommendation. . . . . . . . . . . . . . . . . . . . . . . 8

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

## FEDERAL STATUTES, RULES AND GUIDELINES

18 U.S.C. § 1512(c)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

18 U.S.C. § 1512(f)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

18 U.S.C. § 3553(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 10

18 U.S.C. § 922(a)(6). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

U.S.S.G. § 2J1.2(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

U.S.S.G. § 2X1.1(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

On March 6, 2012, defendant Raymond Thomas Jr. entered a guilty plea to conspiracy to impede an official proceeding, in violation of 18 U.S.C. § 1512(c)(2), and as alleged in Count Six of the indictment.  On March 9, 2012, Thomas's co-defendant, Danny Harris, Jr., also entered a guilty plea to Count Six of the indictment.  Harris additionally pled guilty to making false statements in connection with the acquisition of two firearms, in violation of 18 U.S.C. § 922(a)(6), and as alleged in Counts One and Three of the indictment.

Sentencing of both defendants is scheduled to take place before this Court on June 19, 2012 at 2:30 p.m.  The government submits this Sentencing Memorandum in order to discuss Thomas's offense conduct, advise the Court of its calculation of the applicable sentencing guidelines, and advise the Court of its sentencing recommendation.

## DISCUSSION

### A. The Offense Conduct

During the fall of 2010, when Thomas engaged in the conspiracy to impede an investigation that forms the basis of Count Six, Thomas was employed as a police officer with the Richmond Police Department ("RPD").  He had been so employed since September 2002.

In approximately June 2008, Harris and co-defendant Raymond Thomas, Jr., who was also a police officer with RPD, incorporated and obtained a state license for Strategic Reliance Security Group (hereinafter "SRSG"), a private patrol business.  According to witnesses whom the government has interviewed, Harris ran the business.  They were not aware of any day-to-day involvement by Thomas in the operation of the business.  Harris obtained contracts with public housing and other entities to provide armed private security guard services.  According to Lt. Manjit Sappal at RPD, the Department has a policy that requires anyone who has an outside employment interest to submit a request for approval to work secondary employment.  This would include operating a private security guard business.  Lt. Sappal has advised that in 2009 there was an Internal Affairs

///

1  Investigation into Harris's and Thomas's ownership of the private security guard

2  company, and they were told to cease and desist due to a conflict of interest.

3       As described in the Government's Sentencing Memorandum for co-defendant

4  Harris, while working as a police officer with RPD, Harris was involved in running the

5  Police Department's Explorer Program.  In that program, young men and women between

6  the ages of 14 and 20 participate in the Explorer Program as a way of engaging in

7  community service and in order to assess whether they might want to pursue a career in

8  law enforcement.

9       Despite the RPD admonishment not to continue operating SRGS, Harris continued

10 to do so.  This involved recruiting at least two former Explorers, Sergio Rios and Orlando

11 Torres, to work as armed private security guards for the business.  The fact that Harris

12 was continuing to operate the company came to light in early September 2010, when Rios

13 told RPD Captain Alec Griffin, a patron at Rios's father's dry cleaning business, about

14 some issues that SRSG employees were having regarding not getting paid in a timely

15 fashion.  In the course of the conversation, Captain Griffin learned that Harris was

16 operating SRSG and had recruited some former RPD Explorers to work for him.  Captain

17 Griffin reported this information to RPD, which then initiated two investigations.  One

18 was an internal affairs investigation into the fact that Harris was apparently running a

19 security guard business without RPD knowledge or authorization.  The other was a

20 criminal investigation into how underage SRSG employees had come to possess firearms

21 to use in the course of their employment.

22       Immediately thereafter, RPD Lt. Michael Gormley conducted interviews of Sergio

23 Rios and Orlando Torres.  Rios and Torres are good friends who were Explorers with

24 RPD while in high school.  In their separate interviews, Rios and Torres explained that

25 Harris had recruited them to work for SRSG in the summer of 2009.  Their primary

26 contact was with Harris; Rios recalled that Harris wanted the fact that he was running a

27 security company on the side to be kept confidential.

28 ///

GOVT'S SENT. MEMO [THOMAS]
CR 11-0497 CW                    2

Rios turned three guns over to Lt. Gormley:  a Glock model 17 semiautomatic pistol; a Glock model 22 semiautomatic pistol; and a Sig Sauer pistol.  Rios explained that the Sig Sauer was the "loaner" gun owned by SRSG; it was used by SRSG employees when performing their security guard duties.  The Glock 22 was Torres's gun; he gave it to Rios to turn over to Lt. Gormley.  Rios advised that the Glock 17 was his gun.  When Lt. Gormley asked how Rios came to purchase the Glock 17 pistol, Rios explained that it was difficult to work all the hours required of him at SRSG when there was only one company gun available.  He discussed the issue with Harris, who told Rios that if Rios came up with the money to purchase a gun, Harris could get a law enforcement discount at LC Action Police Supply in San Jose.  Apart from issue of cost, there was a significant legal impediment to Rios simply going out and buying his own gun.  At the time, Rios was only 19 years old.  Under federal law, a federally licensed firearms dealer such as LC Action was prohibited from selling a handgun such as a Glock pistol to someone under 21 years of age.  Harris solved this problem by taking Rios's money, buying the gun for him, and then turning the gun over to Rios so that he could use it while on duty.  In the course of doing so, Harris violated the law by acting as a straw buyer and falsely stating on a federal firearms form that he was the true buyer of the gun.  The firearms form clearly warns the person filling it out that a false statement as to who is the actual buyer is a crime punishable as a felony under federal law.  As discussed in more detail in the Government's Sentencing Memorandum for Harris, Harris's false statement on the federal firearms form in connection with the purchase of the Rios gun forms the basis for Count One of the indictment in this case.  That count is one of the charges to which Harris has pled guilty.

When Lt. Gormley interviewed SRSG Orlando Torres, Torres related similar events regarding his acquisition of the Glock 22 pistol.  Torres told Harris that he could not take all the SRSG work assignments being offered to him because the Sig Sauer was not always available for use when he was on duty.  At the time, Torres was 20 years old.  Harris told Torres that if Torres came up with the money, Harris would purchase the gun

1   for him.  Once Torres was 21 years old, Harris would transfer the registration into

2   Torres's name.  Both Lt. Gormley and subsequently, the FBI, developed evidence that

3   Harris received approximately $500 from Torres, bought the Glock 22 for Torres, and

4   then turned it over to Torres to use while performing his security guard duties.  Again, in

5   the course of making the purchase, Harris lied on the federal firearms form by stating that

6   he was the actual buyer.  This false statement forms the basis of Count Three of the

7   indictment, to which Harris has also pled guilty.

8        It is worth noting at this point that while it was illegal for anyone under 21 to

9   purchase a handgun from a federally licensed firearms dealer, Rios and Torres were not

10  prohibited under federal or California law from possessing and using a handgun in the

11  course of their duties as state-licensed private security guards.  Each had obtained the

12  appropriate license to be a private security guard and to carry a firearm in the course of

13  performing those duties.

14       As noted above, the fact that Harris was continuing to operate SRSG and that he

15  had made straw purchases of guns for Rios and Torres came to the attention of RPD in

16  early September 2010.  At this point in time, Harris had arranged to transfer registration

17  of the Rios gun out of his own name and into Rios's father's name.  However, the Torres

18  gun was still registered to Harris.  By the end of October 2010, the RPD had referred the

19  matter to federal authorities and the FBI initiated an investigation.  It is against this

20  backdrop that Thomas and Harris embarked on a course of action designed to intimidate

21  and harass Rios and Torres; get hold of the Torres Glock 22, which was still registered to

22  Harris and constituted evidence of Harris's straw buyer purchase; and damage the

23  credibility of Rios and Torres as any investigation or proceedings moved forward.

24       This course of action took place from September through early December 2010,

25  and forms the basis of Counts Five and Six of the indictment.  Count Five charges Harris

26  and Thomas with conspiring to prevent Rios or Torres from communicating information

27  about a possible federal crime to a federal law enforcement officer.  In light of the fact

28  that Harris and Thomas were both law enforcement officers and could be assumed to be

GOVT'S SENT. MEMO [THOMAS]
CR 11-0497 CW                    4

familiar with the law, there was a reasonable likelihood that had either Torres or Rios spoken to a law enforcement officer about Harris's straw purchase of one or more of the guns from a firearms dealer (all of whom are federally licensed), at least one of those communications would have been to a federal law enforcement officer.  Count Six – to which both Harris and Thomas have pled guilty – charges the defendants with conspiring to impede an official investigation, that is, a proceeding before a federal grand jury or a judge or Court of the United States.  Again, given that Harris and Thomas were police officers, a federal investigation and possible federal prosecution of Harris for violating federal gun laws was reasonably foreseeable to Harris and Thomas.  The law provides that it is not necessary for an official proceeding to be pending or about to be instituted at the time of the offense.  18 U.S.C. § 1512(f)(1).  Harris's and Thomas's efforts to retrieve the Glock 22 from Torres and damage Rios's and Torres's credibility as witnesses were intended to impede any investigation or prosecution that might develop, including a federal investigation or prosecution.

On September 17, 2010, Lt. Sappal met with Harris and informed him that he was being placed on administrative leave due to the outside employment.  Lt. Sappal informed Harris that he was to have no contact with current or former Explorers.  At that time, Thomas was out on leave for an injury.  A week later, Torres reported to Lt. Sappal that he had received repeated calls and text messages from Thomas demanding that Torres turn his Glock over to Thomas.  Shortly thereafter, the imperative tone and manner of the demands escalated.  On or about September 26, 2010, Thomas sent a letter to Torres stating that he, Thomas, had purchased the gun from Harris, and demanded that Torres deliver the gun.  In the letter, Thomas mentioned "power of attorney."  Torres did not understand what this meant and was intimidated by the tone.

These contacts by Thomas prompted Lt. Sappal to e-mail a letter to Thomas on September 27, 2010, informing Thomas that he was to have no contact with any current or former Explorer.  Thomas telephoned Lt. Sappal and asked if this meant he could not

///

1  pursue a civil action against Torres.  Lt. Sappal told Thomas that the prohibition on

2  contact did not preclude filing a civil action.

3      On September 28, 2010, Thomas took the next step in trying to get the gun from

4  Torres and filed a suit in Contra Costa County Small Claims Court asserting that he had

5  purchased the gun from Harris.  The filing of this suit and Thomas's September 26, 2010

6  form the basis for both Harris's and Thomas's guilty plea to Count Six of the indictment.

7  They both admitted that their goal in Thomas undertaking these efforts was to obtain

8  possession of the Glock 22 pistol, which could be used against Harris in a federal

9  investigation and, possibly, prosecution.  Following his filing of the lawsuit, Thomas had

10  two different attorneys write to Torres demanding delivery of the gun.

11      The first hearing in the Small Claims Court case took place on November 3, 2010

12  and was attended by Thomas.  Lts. Sappal and Gormley also attended, as did Torres.

13  Audio recordings of the proceedings show that the judge was having some difficulty

14  understanding what the suit was about.  At a couple of points during the hearing, Lt.

15  Sappal stated that the gun that was the subject of the suit was in RPD custody.

16  Presumably Thomas heard these statements and understood that the Glock 22 was no

17  longer in Torres's possession.

18      The next day, Thomas and Harris changed tactics and retained the services of

19  private investigator Chris Butler (who has pled guilty to different charges in a separate

20  federal criminal prosecution, *United States v. Christopher Butler*, CR 11-0529 SBA), to

21  target Rios and Torres.  The initial target of this effort was Rios, and the idea was to use a

22  young and attractive female Butler employee to lure Rios into a compromising position.

23  Specifically, the plan was to get the two acquainted, have the female employee flirt with

24  and establish an interest in Rios, and ultimately set up a scenario where Rios was pulled

25  over for driving under the influence and his gun was discovered in his car.  Although the

26  ultimate use of this result was not explicitly discussed with Butler, a reasonable

27  assumption is that to the extent that Rios was in trouble with the law, his credibility and

28  usefulness as a witness against Harris and Thomas would be diminished.  According to

1   Butler and at least one other Butler employee with whom these scenarios were discussed,
2   Harris and Thomas approved of this plan.  Butler and the employee did not know what it
3   was that Harris and Thomas had against Rios and Thomas; they recall the officers saying
4   that Rios and Torres were no good and had gotten them into trouble.  Thomas used his
5   credit card to pay the initial retainer and subsequent charges for Butler's services.

6        It was no coincidence that Harris and Thomas ended up going to Butler when they
7   wanted to target someone whom they wanted to get in trouble.  Only two months earlier,
8   they had retained Butler's services to "dirty up" a fellow RPD officer.  Again using
9   Thomas's credit card, they paid Butler to have an attractive female Butler employee
10  introduce herself to and flirt with the RPD officer; text him and express an interest in
11  further meetings; and ultimately meet with him with the goal of luring him into a
12  compromising position.  The operation was successful, and according to Butler
13  employees who were present when the audio and videotapes of the RPD officer kissing
14  the young woman in a public parking lot were played for Harris and Thomas, the clients
15  were extremely pleased with the results.

16       Butler and his associates undertook the new assignment with the goal of getting
17  Rios in a compromising position, and accomplished a number of steps toward that
18  objective.  A young female Butler employee targeted Rios and met him at his job as a
19  security guard at a movie theater.  From there, they engaged in flirtatious text messages
20  and met once for a casual date.  Text messages in late November and early December
21  2010 show that the young woman was arranging for Rios to meet with her and another
22  girl and encouraging Rios to bring his gun.  Before the planned date in early December
23  took place, a Butler employee who felt badly about the set-up that was about to take place
24  sent an anonymous message to Rios via Rios's Facebook page and warned him against
25  going on the date.  Rios heeded the warning and had no more contact with the young
26  woman.  From that point on, Harris and Thomas took no further steps in the efforts to put
27  Rios or Torres in compromising positions or to get either of the guns back.
28  ///

**B.  The Guidelines Calculations**

The parties and the U.S. Probation Officer concur in the calculation of the sentencing guidelines as to Thomas.  Pursuant to U.S.S.G. §§ 2X1.1(a) and 2J1.2(a), the based offense level for Count Six, conspiracy to impede an official investigation, starts at 14.  That is reduced by three levels for the fact that the offense was a conspiracy, bringing the offense level to 11.  The government agrees with the Probation Officer's determination that Thomas has accepted responsibility and the two-level reduction in the base offense is applicable, thereby reducing the base offense level to 9.  Thomas has no criminal record and thus falls within Criminal History Category I.  Accordingly, the applicable sentencing guideline range is 4 to 10 months.

**C.  The Government's Sentencing Recommendation**

Pursuant to the provisions of 18 U.S.C. § 3553(a), which require the Court to take into account a number of factors, including the sentencing guidelines, in determining the sentence, the government recommends that the Court impose a sentence of 4 months imprisonment.  This is a sentence that is sufficient, but not more than necessary, to comply with the purposes of sentencing, as set out in § 3553(a).

A sentence at the low end of the applicable guideline range is entirely appropriate for several reasons.  Although Thomas entered his guilty plea as trial preparation was underway, he was the first of the two defendants to reach a plea agreement with the government and enter a guilty plea.  In doing so, Thomas admitted his criminal culpability in conspiring with Harris to impede the investigation of Harris.  In connection with the Presentence investigation, Thomas expressed full acceptance of responsibility for his actions and remorse for stepping "past the line."  These are mitigating factors that weigh in favor of a low-end sentence.

There are also factors relating to Thomas's history and characteristics that similarly weigh in favor of a low-end sentence.  The Presentence investigation reveals Thomas's significant accomplishments in acquiring a college degree, attending police training, and working as a police officer for 8 ½ years with RPD.

Nevertheless, starting in September 2010, Thomas engaged in a series of acts that were entirely inconsistent with his oath to enforce and uphold the law.  Although Thomas's unlawful conduct was not nearly as egregious or long-running as Harris's, the same two factors that render Harris's conduct so serious are also present in Thomas's case.

First, this was not a matter of engaging in a single act of bad judgment.  Instead, there was a series of acts that took place from mid-September through late November 2010, and with sufficient time to reflect and decide that this was neither a smart, nor lawful, course.  Thomas's efforts to retrieve evidence that could be used against Harris and to intimidate and compromise witnesses against Harris started with Thomas making calls and sending text messages to Torres demanding delivery of the Glock 22 to Thomas.  Then Thomas mailed the September 26, 2010 letter to Torres in which he told Torres that he had bought the gun from Harris and had power of attorney.  At this point, Lt. Sappal spoke with Thomas and told him to have no further contact with any current or former Explorers, such as Torres or Rios.  Thomas asked if that precluded going forward with a civil suit and Lt. Sappal told him it did not.  Rather than taking stock and deciding not to engage in any further efforts to retrieve the gun from Torres, Thomas went ahead and filed a civil suit in Small Claims Court on September 28, 2010.  Thomas has admitted, as part of his guilty plea, that he undertook these acts in an effort to assist Harris in obtaining possession of the Glock 22 and knowing that the gun could be used against Harris in a federal grand jury investigation or federal court proceedings, and with the intention of impeding such proceedings.

Thomas did not limit his efforts to assist Harris to those described above.  When he learned at the November 3, 2010 hearing in the Small Claims Court case that RPD had custody of Torres's Glock 22, Thomas joined Harris in the new tactic of damaging Torres's and Rios's credibility by hiring private investigator Chris Butler to set them up.  As Thomas had done when he and Harris had recently hired Butler to run a "sting" operation on an RPD colleague, Thomas paid for Butler's services.

The second aggravating factor in Thomas's case is the fact that he engaged in all of these acts while employed as a law enforcement officer.  For a law enforcement officer to conspire with another officer in an effort to deflect an investigation, interfere with justice by retrieving evidence, and purposely interfere with witnesses is an extremely serious breach of that officer's commitment to uphold the law, as well as his own integrity and honesty.  This factor, joined with the fact that Thomas had time to extricate himself from this course of conduct, but elected not to do so, weighs strongly in favor of imposing a term of imprisonment.

The government is not aware of exactly when, how, or under what circumstances Thomas became involved in this effort to assist Harris.  Nor has the Presentence investigation provided any insight into why Thomas chose to go in this direction and place so much at risk for Harris.  Whatever the reasons, the fact remains that Thomas broke the law and violated his oath as a police officer in the process.  Section 3553(a) requires the Court to impose a sentence that reflects the seriousness of the offense, promotes respect for the law, and provides just punishment for the offense.  A sentence of four months imprisonment, followed by a three-year term of supervised release, accomplishes that goal.

## CONCLUSION

For the reasons stated above, the government recommends that the Court impose the following sentence on defendant Raymond Thomas, Jr.: four months imprisonment; a three-year term of supervised release with the conditions recommended in the Presentence Report; and a $100 special assessment.

///

///

///

///

///

///

GOVT'S SENT. MEMO [THOMAS]
CR 11-0497 CW                    10

1  In light of Thomas's current financial situation, the government concurs in the Probation

2  Officer's recommendation that no fine be imposed.  There are no restitution issues.

3

4  Dated: June 12, 2012                    Respectfully submitted,

5                                          MELINDA HAAG
                                           United States Attorney
6

7                                          _____/s/_____
                                           SUSAN E. BADGER
8                                          HARTLEY M.K. WEST
                                           Assistant United States Attorneys
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

GOVT'S SENT. MEMO [THOMAS]
CR 11-0497 CW                    11